UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| RONALD SCHMUCKER, et al., | ) |
|---|---|
| Plaintiffs, | ) |
| v. | ) Case No. 3:14-CV-1593 JD |
| JOHNSON CONTROLS, INC. et al., | ) |
| Defendants. | ) |

**OPINION AND ORDER**

This case is set for a bench trial. In this order, the Court addresses a number of evidentiary disputes, including motions in limine, objections to expert testimony, and objections to exhibits.

**I. MOTIONS IN LIMINE**

Johnson Controls filed a number of motions in limine, each of which the Court considers in turn.

**A.  Chemicals other than TCE posing an endangerment**

Johnson Controls first moves to exclude any evidence that chemicals other than TCE may pose an endangerment. To begin with, the Court already made such a ruling at summary judgment, holding that the Plaintiffs could not present evidence "that compounds other than TCE present a danger in their own right," as the Plaintiffs did not develop that evidence during discovery. [DE 351 p. 20]. To the extent the Plaintiffs offer evidence of other chemicals posing an endangerment, the Court will disregard that evidence accordingly, but the Plaintiffs represent that they have no intent to do so.

The two specific objections that Johnson Controls raises on this topic are misplaced, though. Johnson Controls first objects that Dr. Keramida is opining that the presence of other

chemicals makes TCE more dangerous, which it characterizes as a back-door way of arguing the health effects of those other chemicals. However, Johnson Controls' argument rests on mischaracterizations of her testimony. Dr. Keramida relies on the other chemicals solely to determine the applicable screening levels to use for TCE. She explains in her most recent supplemental report that, due to the presence of other chemicals, a Hazard Quotient of 0.1 rather than 1 is appropriate. [DE 382-1 p. 6 (opining that, because of the presence of other chemicals, "the USEPA advises the use of a Hazard Quotient of 0.1, rather than 1, which is applicable when only one chemical is present")]. That is exactly the same thing she said in her initial report, as the Court even noted when it excluded her opinion on the effects of other chemicals. [DE 351 p. 18 (noting that Dr. Keramida referenced other chemicals "to explain the effect they have on the applicable screening levels *for TCE*")]; 275-3 p. 31 (identifying the applicable screening level as 0.21 $\mu g/m^3$, based on a Hazard Quotient of 0.1, and explaining that that "is the recommended [Hazard Quotient] when an individual may be exposed to more than one chemical")].

  The Plaintiffs confirmed at the final pretrial conference that Dr. Keramida's opinion in this regard is limited to identifying the applicable screening levels for TCE. Johnson Controls also explained how its own expert has responded directly to that opinion and has discussed why Dr. Keramida's reliance on that Hazard Quotient is unfounded. Because Dr. Keramida's opinion in this regard is not new, and because Johnson Controls has already addressed it through its own experts, there is no reason to exclude this opinion. Should Dr. Keramida (or any other expert) offer additional opinions or explanations at trial not contained in her reports, the Court will not consider those new materials, but the Court construes her supplement as referencing the effects of other chemicals solely for the purpose of identifying the applicable screening level for TCE.

Her opinion in that regard complies with the Court's prior order, so the Court declines to strike that opinion.

Johnson Controls next objects to Dr. Keramida's consideration of other chemicals for the purpose of establishing the course of the migration from the Johnson Controls site. It suffices to say on this point, though, that Johnson Controls' objection has nothing to do with whether those other chemicals pose an endangerment in their own right, which is the reason Johnson Controls moves to exclude this evidence. The relevance of this line of evidence is to show that a pathway exists for exposure to TCE. Again, if the Plaintiffs were to argue that exposure to the other chemicals may pose an endangerment, the Court would not consider the evidence for that purpose, but the Plaintiffs have confirmed they have no intent to do so. Because Dr. Keramida's supplemental report addresses the most recent testing data and does not transgress the Court's prior order, the Court declines to strike her opinions on this basis.

**B.**     **Dr. Keramida's November 2018 home inspections**

Johnson Controls next moves to strike evidence of home inspections that Dr. Keramida conducted in November 2018, after discovery had already closed and the motions for summary judgment were already ripe. Dr. Keramida visited certain homes in the neighborhood to assess the presence of vapor intrusion through utilities. Most notably, she used a photoionization detector to identify potential vapor entry points into a home. Johnson Controls argues that this was an untimely investigation and should be excluded.

The Court agrees. There is no reason this investigation could not or should not have been done during discovery. Vapor intrusion through preferential pathways has always been at issue in this case, and Dr. Keramida addressed it in her initial report. Whatever insight these home inspections and photoionization detector readings may have to offer into the threat of vapor intrusion through utilities, the Plaintiffs had every reason to develop that evidence during

discovery. The Plaintiffs argue that these inspections permissibly respond to maintenance performed on the vapor mitigations systems in 2018, but that maintenance is a red herring. As Dr. Keramida herself has repeatedly opined, including in her recent supplement, vapor mitigation systems do not address vapor intrusion through utilities. [DE 382-1 p. 6 ("Vapor entry points directly into homes from sewer lines bypass the sub-slab of a home and, therefore, are not addressed by a vapor mitigation system applied to the sub-slab.")]. The maintenance on those vapor mitigation systems thus cannot justify this untimely investigation into vapor intrusion through utility lines.

At the final pretrial conference, the Plaintiffs argued that these inspections were also justified by the severance of a utility line running through the former site, and that the inspections were meant to assess the effect, if any, of that new development. Again, the Court is unconvinced, and finds that to be another attempt to bootstrap this untimely investigation. The Plaintiffs did not conduct a similar investigation prior to that work, so they have no baseline to compare the recent inspections against to determine the effect of that work. The Plaintiffs also acknowledge that the photoionization detector cannot identify what compounds are present or where they came from. Having failed to show how these readings could determine the effect of the sewer work, they cannot argue that these inspections were justified by that development. Moreover, the Plaintiffs acknowledge that the purpose of the photoionization detector readings was to show that a pathway exists for the subsurface migration for volatile compounds. [DE 417 p. 17]. That was equally relevant during discovery and has little connection to the severance of the sewer lines at the site.

The Court therefore grants the motion to exclude evidence of Dr. Keramida's November 2018 home inspections, subject to one exception. During her inspections, Dr. Keramida also

observed the vapor mitigation systems that had recently been serviced, and some of her opinions address the effect of that maintenance. Her opinions in that regard largely reiterate her previous criticisms of the vapor mitigation systems, and it would be unfair to allow Johnson Controls to invoke the maintenance performed on the systems without allowing the Plaintiffs to address the effect of that work. Thus, the Court will permit Dr. Keramida to testify about her observations of the vapor mitigations systems from these inspections, to address the effect of the recent maintenance on her opinions about the effectiveness of those systems.

**C.      Goshen utilities info**

Johnson Controls next raises a similar objection to utilities information that Dr. Keramida recently obtained from the City of Goshen. First, it objects to "water and sewer cards" that Dr. Keramida obtained. Those materials date back to the 1980s, and the Plaintiffs offer no reason why they could not have obtained them during discovery. In fact, the Plaintiffs do not acknowledge these materials in response to the motion or attempt to defend their late disclosure. The Court thus grants the motion to exclude the newly obtained water and sewer cards.

Johnson Controls also objects to recent information Dr. Keramida gathered relating to the status of a water line that runs through the site. In her most recent supplement, Dr. Keramida noted that it has come to her attention that a waterline adjacent to the site may still be active. The Plaintiffs represent that they, Johnson Controls, and the City of Goshen had all previously believed the line had been taken out of service. At her deposition, Dr. Keramida testified about additional information she obtained subsequent to her report. She noted that she spoke to a Goshen employee, who revealed that a recent test showed that some water was still reaching a fire hydrant on the line, suggesting that the line was not completely sealed and raising the possibility that the line was still carrying water into homes in the neighborhood. Johnson Controls objects to this information as untimely. The Court agrees.

The Plaintiffs respond that the possibility that the water line is active is a new fact that did not come to light until recently. This may well be a "new fact." The problem is that it shouldn't be. The Plaintiffs had an extensive discovery period in which to conduct an investigation into any conditions that could pose an endangerment—an issue on which they bear the burden. They could have determined during that time the status of any water lines that could contribute to an endangerment. They haven't offered an adequate explanation for why they did not do so. They cite new documents that came to light that triggered this inquiry, but haven't shown either that the documents are so different from documents they had during discovery that they justify this untimely inquiry, or that the timing of the production of those documents was improper.

Moreover, this new, untimely information is plainly prejudicial. Even by the Plaintiffs' own description of this new evidence, it is tentative and would require further investigation to assess what amount of water is actually traveling through the line and whether and in what amount it may carry TCE to the Plaintiffs' homes. Johnson Controls has no ability to conduct follow-up discovery into what exactly the City of Goshen determined about the water line, either. The Court therefore grants this motion and excludes the information obtained by Dr. Keramida about the water line after August 26, 2019 and any opinion based on that information.

**D.     Dr. Keramida's testimony about what RCRA requires**

Next, Johnson Controls moves to exclude any testimony by Dr. Keramida about what RCRA "requires." The Court agrees that such testimony would be irrelevant; the question at trial is not whether Johnson Controls is in violation of any RCRA requirements, nor is the content of legal requirements subject to expert testimony. The Court thus grants the motion to that extent. The Plaintiffs clarified, however, that Dr. Keramida's testimony in this regard will be limited to

identifying applicable screening or cleanup levels. If limited in that manner, this testimony would be acceptable.

**E.      Dr. Orris' supplemental opinion about sewer lines**

Johnson Controls also moves to exclude a supplemental opinion by Dr. Orris, a medical doctor who opines about the health effects of TCE. In his initial report, Dr. Orris opined that TCE may pose an endangerment to human health in the Plaintiffs' neighborhood by inhalation of TCE vapors. After summary judgment, the Court reopened discovery for the narrow purpose of considering the most recent testing data and developments in the area. That testing data included sewer vapor sampling. Dr. Orris reviewed that data and addressed it in his supplemental report: "My concern over the threat of TCE exposure is also confirmed by sewer vapor sampling . . . within the sewer line along Monroe Street. Dr. Keramida's testing showed levels of TCE as high as 270 µg/m3 within this sewer line . . . . These TCE vapors within the public sewer, which are connected to 1008 E. Monroe and other homes in the Neighborhood, present an imminent and substantial endangerment." [DE 382-2]. Johnson Controls objects, arguing that this opinion about vapors in the sewers posing an endangerment is a new opinion that should have been included in the initial report.

The Court agrees. Not only is this an untimely opinion, but it is difficult to see how the analysis in the supplemental report supports it. Dr. Orris is not opining that an endangerment would come from possible exposure within the sewer lines themselves; the concern is that the vapors in the sewers would migrate into homes in dangerous amounts. To the extent Dr. Orris is opining that the contamination in the sewers will reach the indoor air, though, that is an issue of vapor migration outside his expertise as a medical doctor. The Plaintiffs respond that he does not offer such an opinion, and that they will instead rely on Dr. Keramida to establish that the contamination in the sewers can reach the indoor air. The problem, however, is that Dr. Orris

does not couch his opinion in that manner, nor does he identify any assumption on which he is relying about how much contamination may reach the indoor air. He offers only a conclusory assertion that the "TCE vapors within the public sewer . . . present an imminent and substantial endangerment." [DE 382-2]. Moreover, Dr. Orris already opined in his initial report that concentrations of TCE to which homes in the neighborhood have been exposed pose an endangerment to health. The Plaintiffs can rely on that initial opinion (subject to Johnson Controls' Rule 702 objection), and can seek to establish through Dr. Keramida's testimony that those concentrations are still at risk of occurring, whether through the sewers or otherwise. But Dr. Orris' recent addition that the contamination in the sewers itself presents an endangerment extends beyond his initial report and lacks a sufficient explanation in his supplemental report. The Court thus grants this motion and excludes that opinion in Dr. Orris' most recent supplemental report.

**F.     Testimony by the plaintiffs themselves**

Johnson Controls next moves to exclude testimony by the plaintiffs themselves. It argues that the issues in this case—whether an endangerment exists and what remediation should occur—are highly technical and outside the knowledge of the individual plaintiffs. The Plaintiffs largely acknowledge that point. They have agreed to look again at whether to call the individual plaintiffs, and they intend to limit the scope of that testimony to relevant factual matters within their knowledge as lay witnesses. Based on those representations, the Court declines to exclude or further limit this testimony at this time, though it again encourages the Plaintiffs to consider whether this testimony is necessary to present at trial. Johnson Controls also objects that the Plaintiffs did not disclose themselves as witnesses in their disclosures. In response, the Plaintiffs agreed to limit the scope of their testimony to the matters they testified to at their depositions. Again, given that understanding, the Court declines to further limit this testimony at this time.

### G. Laszlo Pinnyei

Finally, Johnson Controls moves to exclude evidence relating to an individual named Laszlo Pinnyei, who used to live in the neighborhood. This motion is granted as unopposed.

## II. *DAUBERT* MOTIONS

At summary judgment, the Court resolved each of the *Daubert* objections to Johnson Controls' experts, as well as some of the *Daubert* objections to Dr. Keramida's testimony relating to vapor intrusion in the Plaintiffs' homes. The Court took under advisement the remaining objections, which addressed Dr. Orris' opinions and the remainder of Dr. Keramida's opinions. As the Court explained, those objections do not need to be resolved prior to trial in a bench trial. Because trial is necessary anyway, and because those opinions and the objections to them are complex, the Court believed it would be better positioned to resolve those objections after trial, once it has heard the testimony and considered all of the evidence.

At a scheduling conference, Johnson Controls requested permission to file "very targeted" motions before trial on "very narrow" issues. [DE 361 p. 11]. The Court granted that permission. The motions Johnson Controls actually filed, though, are expansive and seek to exclude Dr. Keramida's and Dr. Orris' opinions almost in their entirety.[1] The Court understands that Johnson Controls' first preference is to exclude those opinions at the outset. But the Court already decided at summary judgment not to do so. Johnson Controls' present motion raises little beyond a disagreement with that decision, and the reasons the Court had for taking those objections under advisement pending trial apply equally now. Thus, the Court declines to entertain these motions in large part.

---

[1] Johnson Controls nonetheless represents that it would raise still further objections at trial. [DE 389 p. 4 n.3; 388 p. 2 n.1]. There is no reason to indulge that piecemeal motion practice.

Only one issue raised in the motions is actually a narrow, discrete issue that can readily be resolved at this stage. In his August 2019 supplemental report, Dr. Orris opines that the level of TCE vapors detected in one home present an imminent and substantial endangerment to human health, "especially when the mitigation systems throughout this Neighborhood do not actually remove TCE from the environment, but instead pump it above ground and discharge the TCE back into the Neighborhood air." [DE 382-2 ¶ 3]. Dr. Orris expanded on that opinion during his depositions, explaining that an endangerment exists in the neighborhood in part because the mitigation systems vent the TCE vapors into the outside air, where people in the community continue to be exposed to those vapors. [*E.g.*, DE 389-1 p. 34 ("And there's also, in this situation, a rather clear community exposure since [the mitigation systems] are pumping stuff out from -- from large amounts below the slabs and releasing it in the air just on the -- you know, one -- one story above. So clearly the exposures here were community wide . . . ."); 389-2 p. 49–50, 52–53, 99–101].

This opinion fails Rule 702's reliability prongs, as Dr. Orris failed to consider what amount of contamination would be produced in the outside air from vapors vented by the mitigation systems. As the Plaintiffs acknowledge, Dr. Orris did not "develop an opinion about the output at the end of the pipe." [DE 417 p. 36]. In other words, he did not consider the level of TCE vapors that would result once the vapors left the mitigation systems and mixed with the outdoor air. Without considering what the concentrations would be once anyone encounters and inhales the vapors in the outside air, Dr. Orris has no basis upon which to opine that those exposures would create (or contribute to) an endangerment to human health. Nor does Dr. Orris identify any methodology that would allow him to draw such a conclusion. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459–60 (7th Cir. 2019); *Am. Honda Motor Co. v. Allen*, 600

F.3d 813, 817 (7th Cir. 2010). Therefore, the Court excludes any opinion by Dr. Orris that the vapor mitigation systems are ineffective because they vent rather than treat the TCE vapors, or that they create an endangerment by venting the vapors into outdoor air. His opinions will be limited (subject to Johnson Controls' outstanding objection) to any endangerment posed by the inhalation of TCE vapors in indoor air.

## III. EXHIBIT OBJECTIONS

The parties filed numerous objections to exhibits. The Court addresses some of them below. The remaining objections (mostly going to relevance or foundation) are better resolved at trial should the need arise; the parties should raise those objections as appropriate at that time.

**Expert reports**

First, the Plaintiffs initially objected to the admission of expert reports, noting that those reports would typically constitute hearsay and would not be admitted into evidence at trial. They have now withdrawn that objection, and the parties each agree that both sides' expert reports can be admitted into evidence (subject to any outstanding *Daubert* objections). Because this is a bench trial, the Court concurs that this is an effective way of streamlining trial and facilitating the presentation and understanding of the experts' extensive and complex opinions, as suggested by the Manual for Complex Litigation.

At the final pretrial conference, the parties also discussed the manner of presenting the experts' testimony and whether any limits should be placed on their direct examinations. The Court declines to set time limits on direct examinations, as suggested, but wishes to offer two alternatives in that regard. First, the parties need not offer direct examinations at all. The experts' opinions are already contained in their expert reports, which will be admitted into evidence, so the experts may adopt those reports without needing to recite their contents in court. *See* Manual for Complex Litigation § 12.51 ("[A] court may consider ordering witnesses under the parties'

control to present their direct testimony in substantial part through written statements prepared and submitted in advance of trial. At trial, the witness is sworn, adopts the statement, may supplement the written statement orally, and is then cross-examined by the opposing counsel and perhaps questioned by the judge."). If the parties wish to highlight certain aspects of the experts' opinions during direct examinations, they may do so, but admitting the expert reports means the parties should need to spend little, if any, time on direct examinations.

Second, along the same lines, the Court will permit the parties to offer the experts' direct testimony through narrative statements submitted prior to trial, as outlined in the Manual for Complex Litigation. This approach is also suggested by the Civil Litigation Management Manual, p. 113 (2d ed. 2010) (suggesting that courts "have direct testimony of witnesses under the parties' control submitted and exchanged in advance in narrative statement form"). This would allow the parties to prepare the direct testimony in advance, and would also promote clarity of the record and the efficient use of trial time. The Court will not require the parties to present the testimony in this manner, but the Court strongly encourages the parties to consider presenting direct testimony through the expert reports or written statements. Should the parties wish to offer written statements, they should file those statements two weeks prior to trial. In addition, all experts' testimony should be limited to the opinions duly disclosed in their expert reports; whether the experts testify orally or in writing, the parties should be prepared offer specific citations to the experts' reports in support of any opinions offered at trial.

**Supplemental figures prepared by Dr. Zeeb**

The Plaintiffs also object to supplemental figures prepared by Dr. Zeeb, which were disclosed for the first time the morning of his deposition—after the deadline for the disclosure of supplemental expert reports. Johnson Controls withdrew some of those exhibits, but stands on

others. Those include six exhibits that Dr. Zeeb updated from previous figures to reflect the most recent data,[2] plus a spreadsheet to which Dr. Zeeb added calculations. Johnson Controls offers no excuse for its failure to disclose these exhibits by the deadline for producing supplemental reports. Instead, it argues primarily that the late disclosure was harmless because it produced the exhibits on the morning of Dr. Zeeb's deposition, so the Plaintiffs could have asked him about the exhibits at that deposition. The Plaintiffs were still prejudiced by not being able to review those revised figures before the deposition, though. The Court set a deadline for the production of supplemental reports—at Johnson Controls' urging, and over the Plaintiffs' objection—so that the parties would have time to review the reports and prepare for the depositions. Johnson Controls also argues that these are figures Dr. Zeeb previously prepared, just updated with new data. But by failing to timely produce these updated figures, Johnson Controls deprived the Plaintiffs of the ability to meaningfully review the new figures so they could be prepared to question Dr. Zeeb in detail about any differences. Johnson Controls also argues that Dr. Zeeb merely added "some basic arithmetic" to the spreadsheet showing the pumping data from the wellfield. But basic or not, that calculation should have been in Dr. Zeeb's report if Johnson Controls wished to rely on it. Neither side's experts should be offering opinions not properly and timely disclosed in their reports.

For those reasons, the Court sustains the Plaintiffs' objection to these exhibits. However, Johnson Controls may use prior versions of these exhibits that were timely disclosed during discovery.

---

[2] For example, two of the exhibits are maps of the area that depict the scope of the wellfield, with arrows showing the direction of groundwater travel. The arrows in the more recent versions of the figures point in slightly different directions than the originals, apparently reflecting the more recent data.

**Dockets of litigation involving the Plaintiffs**

The Plaintiffs object to printouts of court dockets of unrelated litigation involving some of the plaintiffs. Johnson Controls agreed to withdraw these exhibits. [DE 399 p. 7].

**Demonstrative PowerPoint presentation**

Johnson Controls first objects to a PowerPoint presentation that the Plaintiffs intend to offer as a demonstrative exhibit, presumably in connection with an opening statement. Johnson Controls' objections generally argue that the slides lack foundation or are unsupported by admissible evidence, or that the inferences they anticipate the Plaintiffs will attempt to argue based on those materials are unfounded. Parties, however, generally receive a fair degree of leeway in presenting demonstrative materials. Courts understand that demonstrative exhibits are "argumentative and persuasive in nature." *Baugh ex rel. Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701, 708 (7th Cir. 2013). Demonstrative exhibits are not themselves evidence, and to the extent the Court finds that the exhibit at issue is not supported by evidence that has been admitted at trial, the Court will not consider it. As to Johnson Controls' arguments that the materials underlying this demonstrative exhibit are inadmissible, the admissibility of those materials is better addressed in connection with those underlying exhibits, not indirectly through rulings as to a demonstrative exhibit. The Court thus overrules this objection and will allow the Plaintiffs to use this exhibit as a demonstrative aid, though the exhibit will not be introduced into evidence.

**Agency levels outside Indiana**

Johnson Controls next objects to exhibits reflecting the screening levels or similar guidance from agencies outside of Indiana. It argues that the site at issue is under the oversight of the Indiana Department of Environmental Management, so the levels adopted by other agencies are irrelevant. This objection is misplaced. As Johnson Controls is quick to point out in other

contexts, the issue at trial is not whether Johnson Controls is in compliance with its regulatory obligations—the Court granted summary judgment in Johnson Controls' favor on the Plaintiffs' "violation" claim. Instead, the question is whether the contamination may present an endangerment. And as discussed at summary judgment, courts have held that agency screening levels are an appropriate factor to consider in deciding that question. [DE 315 p. 12–13, 52–53]. Johnson Controls has offered no principled basis for holding that only the overseeing agency's screening level is relevant in that regard—an endangerment claim is not governed by regulatory screening levels, and there is no reason that the same endangerment in one state should not be considered an endangerment in another just because the other state adopted more lenient standards. Indeed, RCRA's citizen-suit provisions exist because an overseeing agency may fail or be unable to address an endangerment on its own. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 499 (7th Cir. 2011). Johnson Controls is free to argue that Indiana's levels are appropriate and that the other agencies' levels are unsound or not indicative of an endangerment, but that is a question of weight, not admissibility. The Court thus overrules this objection.

However, as noted at the final pretrial conference, the Court does not intend to allow any such materials that were not promulgated prior to the close of discovery in this case. New materials produced after that point create prejudice to the opposing side, and though some developments may have occurred (and may continue to occur), the Court must set limitations to allow trial to proceed and to ensure both sides have had the ability to confront any evidence.

**Judicial notice of agency materials**

The Plaintiffs relatedly filed a motion for judicial notice of agency materials reflecting the screening levels adopted by various states or agencies. Under Rule 201, a court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately

15

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *Gen'l Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). The Plaintiffs' motion identified a number of materials that have been published by various agencies through their respective websites, and they ask for judicial notice that the agencies adopted the action levels for TCE reflected in those materials.

Johnson Controls opposes the motion, but its arguments are largely non-responsive to the Plaintiffs' request, which is much narrower than Johnson Controls portrays it. Johnson Controls argues, for example, that judicial notice of agency action levels is inappropriate because the validity of those levels is hotly disputed in this case and even among the agencies. However, the Plaintiffs have clarified that they are not asking the Court to take judicial notice that any agency's level is the *correct* one, only that an agency in fact adopted a particular level. The fact that an agency in fact adopted such a level cannot be reasonably disputed, as it is shown by the agency's own publications.[3] That fact is also relevant. For example, one of the reasons Johnson Controls offers for discounting an action level on which the Plaintiffs rely is that it is an outlier that has been rejected by other agencies. The mere fact that other agencies have adopted similar levels is responsive to that weight-of-authority argument.

Therefore, the Court grants the Plaintiffs' request, only to the extent that the Court takes notice that the agencies made the statements or took the positions reflected in these materials.

---

[3] In that respect, Johnson Controls is largely correct that the Plaintiffs' request is akin to authenticating the materials in question—they are asking for judicial notice that the agencies said the things reflected in those materials, not that those statements are correct. Perhaps authentication would be the better way to frame the request, but the Court need not belabor that semantic distinction. To be clear, the Court grants the request for judicial notice solely to the extent the Plaintiffs articulated that request at the final pretrial conference: "We're not asking the Court to do any more than judicially notice that these are publicly available websites. The agencies have taken the action they've taken. We're not asking the Court to say these are the appropriate actions. And that's the extent of it." [DE 417 p. 64–65].

**Health effects of chemicals other than TCE**

In response to Johnson Controls' objection, the Plaintiffs agreed to withdraw the exhibits pertaining to the health effects of chemicals other than TCE. [DE 409 p. 9].

**Relevance objections**

Johnson Controls objects to multiple categories of exhibits on relevance grounds. This includes evidence of historical spills, exhibits pertaining to facts that have already been admitted or stipulated, testing data going back decades, discovery responses from *Hostetler*, testimony about the disposal of well "purge water" in sewers, IDEM's 2003 request to investigate vapor intrusion, and other evidence. Though these categories encompassed scores and scores of exhibits in their exhibit list, the Plaintiffs now represent that they have winnowed the total number of exhibits they will likely use at trial to about fifty or sixty. They also represent that they anticipate being able to present their entire case in chief in about two days.

Because this is a bench trial, the Court need not police relevance quite as strictly, and it need not be concerned about misleading or confusing the jury. If the evidence is not relevant, it will not affect the outcome, but that need not be decided as a matter of admissibility. Though in most instances the Court agrees with Johnson Controls that the evidence subject to these objections is of limited value, the Court declines to exclude this evidence at this time. However, should the parties detour into these issues at unnecessary length during trial, the Court will limit the evidence at that time.

**Asbestos**

The Plaintiffs agreed to withdraw the objected-to exhibits relating to asbestos. [DE 409 p. 14].

**Tocon's disposal of drums**

Johnson Controls objects to evidence of Tocon's disposal of hazardous wastes at the site. In response, the Plaintiffs note that this evidence may be unnecessary if the Court grants entry of default against Tocon. The Court has now done so, which presumably moots this objection. Should any issue relative to these exhibits remain outstanding, the parties should raise it at trial.

**Hearsay**

Johnson Controls objected to almost fifty exhibits on the basis that they contain hearsay. It offers little explanation for its objections, though. The Plaintiffs also represent that many of these exhibits would be used only for rebuttal or impeachment (though they also agreed to withdraw some of these exhibits). Rather than walk through all of these objections for which neither party has developed an argument, the Court declines to resolve these objections at this time; Johnson Controls should object at trial if it believes an exhibit is inadmissible as hearsay.

**Scientific studies**

The Plaintiffs identified as exhibits a large number of scientific studies. Johnson Controls objected primarily on hearsay grounds. The Plaintiffs note in response that these are the studies their experts relied on, and that the studies themselves may qualify as learned treatises that can be read into evidence under Rule 803(18). In reply, Johnson Controls states that it will reserve its objection to these studies until trial. The Court agrees with that approach, and will address the use of these exhibits if necessary at trial.

**Johnson Controls' Rule 30(b)(6) deposition**

Johnson Controls objects to the use of a transcript from the deposition of its own Rule 30(b)(6) representative. The federal rules expressly allow the use of such a deposition, though. Fed. R. Civ. P. 32(a)(3). Johnson Controls also objects that some parts of the deposition aren't

relevant, but again, the Court declines to exclude the evidence on that ground at this time. Johnson Controls finally argues that the transcript should not be admitted, as the deposition should only be considered as oral testimony. This is a bench trial, though; the parties need not (and the Court will not permit them to) read the deposition into the record during trial when the Court can simply rely on the transcript for what was said.

**Demonstrative radon mitigation fan**

The plaintiffs listed as an exhibit an actual radon mitigation fan, which they say is similar to the type of system installed in their homes. They intend to use it for demonstrative purposes. Johnson Controls objects because it hasn't seen or been able to inspect the item. The Plaintiffs should make the exhibit available to Johnson Controls prior to trial, but so long as Johnson Controls has had the ability to inspect the exhibit, the Court intends to permit its use as a demonstrative exhibit at trial.

## IV. CONCLUSION

The Court grants in part and denies in part Johnson Controls' motions in limine. [DE 387]. The Court dismisses the motions to strike Dr. Keramida's and Dr. Orris' opinions [DE 388, 389], except that it grants the motion to exclude Dr. Orris' opinions that the vapor mitigation systems create an endangerment. The Court grants the Plaintiffs' motion for judicial notice, to the extent explained above. [DE 410].

SO ORDERED.

ENTERED: October 28, 2019

/s/ JON E. DEGUILIO
Judge
United States District Court